ORIGIN

Approved: _____
JESSICA LONERGAN/MAURENE COMEY
Assistant United States Attorneys

Before:   HONORABLE SARAH L. CAVE
United States Magistrate Judge
Southern District of New York

20 MAG 2109

- - - - - - - - - - - - - - -   x
:
UNITED STATES OF AMERICA        :    **SEALED COMPLAINT**
:
- v. -          :    Violations of
:    18 U.S.C. §§ 371 and
JERMAINE HARMON,                :    201(b)(2)(C)
a/k/a "Mel,"                :
KHARI FAISON,                   :
a/k/a "Country," and       :    COUNTIES OF OFFENSE:
COMPTON RICHMOND,               :    MANHATTAN, BRONX, DUTCHESS,
a/k/a "Rich,"              :    QUEENS
:
Defendants.         :
:
- - - - - - - - - - - - - - -   x

SOUTHERN DISTRICT OF NEW YORK, ss.:

OMAR DAZA, being duly sworn, deposes and says that he is a
Special Agent with the Department of Justice, Office of the
Inspector General ("DOJ-OIG"), and charges as follows:

**COUNT ONE**
**(Conspiracy - HARMON)**

1.    From at least in or about March 2019, up to and
including at least in or about September 2019, in the Southern
District of New York and elsewhere, JERMAINE HARMON, a/k/a "Mel,"
the defendant, and others known and unknown, willfully and
knowingly did combine, conspire, confederate and agree together
and with each other to commit offenses against the United States,
to wit, (1) bribery, in violation of Title 18, United States
Code, Section 201(b)(2)(C), and (2) providing contraband in
prison, in violation of Title 18, United States Code, Section
1791(a)(1).

2.    It was a part and object of the conspiracy that
JERMAINE HARMON, a/k/a "Mel," the defendant, being a public

official, directly and indirectly, corruptly demanded, sought, received, accepted and agreed to receive and accept things of value personally and for another person and entity, in return for being influenced in the performance of an official act and being induced to do and omit to do an act in violation of his official duties, to wit, HARMON, a correction officer at a private detention facility that houses pretrial detainees on behalf of the United States Marshals Service (the "Jail"), solicited and accepted bribes in return for smuggling contraband, including, but not limited to, smokeable synthetic cannabinoids ("K2"), marijuana, Suboxone, tobacco, and a cellular telephone, into the Jail, in violation of Title 18, United States Code, Section 201(b)(2).

3.   It was further a part and an object of the conspiracy that JERMAINE HARMON, a/k/a "Mel," the defendant, and others known and unknown, in violation of a statute and a rule and order issued under a statute, would and did provide to inmates of the Jail contraband, including, but not limited to, K2, marijuana, Suboxone, tobacco, and a cellular telephone, in violation of Title 18, United States Code, Section 1791(a)(1).

## OVERT ACTS

4.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about the summer of 2019, JERMAINE HARMON, a/k/a "Mel," the defendant, smuggled marijuana and tobacco into the Jail for an inmate in exchange for money.

b.   In or about the summer of 2019, a co-conspirator not named herein ("Individual-1") purchased marijuana in the Bronx and Manhattan and provided the marijuana to HARMON for HARMON to smuggle into the Jail for an inmate in exchange for money.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Conspiracy - FAISON)

5.   From at least in or about March 2019, up to and including at least in or about July 2019, in the Southern District of New York and elsewhere, KHARI FAISON, a/k/a

"Country," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, (1) bribery, in violation of Title 18, United States Code, Section 201(b)(2)(C), and (2) providing contraband in prison, in violation of Title 18, United States Code, Section 1791(a)(1).

6.   It was a part and object of the conspiracy that KHARI FAISON, a/k/a "Country," the defendant, being a public official, directly and indirectly, corruptly demanded, sought, received, accepted and agreed to receive and accept things of value personally and for another person and entity, in return for being influenced in the performance of an official act and being induced to do and omit to do an act in violation of his official duties, to wit, FAISON, a correction officer at the Jail solicited and accepted bribes in return for smuggling contraband, including, but not limited to, marijuana, K2, tobacco, alcohol, and a cellular telephone, into the Jail in violation of Title 18, United States Code, Section 201(b)(2).

7.   It was further a part and an object of the conspiracy that KHARI FAISON, a/k/a "Country," the defendant, and others known and unknown, in violation of a statute and a rule and order issued under a statute, would and did provide to inmates of the Jail contraband, including, but not limited to, marijuana, K2, tobacco, alcohol, and a cellular phone, in violation of Title 18, United States Code, Section 1791(a)(1).

<u>OVERT ACTS</u>

8.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about the summer of 2019, KHARI FAISON, a/k/a "Country," the defendant, smuggled marijuana and tobacco into the Jail for two inmates in exchange for money.

b.   In or about the summer of 2019, a co-conspirator not named herein ("Individual-3") purchased marijuana and K2 from a supplier who had brought the marijuana and K2 from Poughkeepsie, New York, and Individual-3 then provided that marijuana to FAISON for FAISON to smuggle into the Jail for an inmate in exchange for money.

3

c.   In or about the summer of 2019, Individual-3 traveled to Poughkeepsie, New York, where she collected a cellular telephone, which she then provided to FAISON for FAISON to smuggle into the Jail for an inmate in exchange for money.

(Title 18, United States Code, Section 371.)

## COUNT THREE
### (Conspiracy - RICHMOND)

9.    From at least in or about June 2019, up to and including at least in or about November 2019, in the Southern District of New York and elsewhere, COMPTON RICHMOND, a/k/a "Rich," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, (1) bribery, in violation of Title 18, United States Code, Section 201(b)(2)(C), and (2) providing contraband in prison, in violation of Title 18, United States Code, Section 1791(a)(1).

10.   It was a part and object of the conspiracy that COMPTON RICHMOND, a/k/a "Rich," the defendant, being a public official, directly and indirectly, corruptly demanded, sought, received, accepted and agreed to receive and accept things of value personally and for another person and entity, in return for being influenced in the performance of an official act and being induced to do and omit to do an act in violation of his official duties, to wit, RICHMOND, a correction officer at the Jail, solicited and accepted bribes in return for smuggling contraband, including, but not limited to, marijuana, into the Jail in violation of Title 18, United States Code, Section 201(b)(2).

11.   It was further a part and an object of the conspiracy that COMPTON RICHMOND, a/k/a "Rich," the defendant, and others known and unknown, in violation of a statute and a rule and order issued under a statute, would and did provide to inmates of the Jail contraband, including, but not limited to, marijuana and a cellular telephone, in violation of Title 18, United States Code, Section 1791(a)(1).

### OVERT ACTS

12.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

4

a.  In or about the summer of 2019, COMPTON RICHMOND, a/k/a "Rich," the defendant, smuggled marijuana into the Jail for an inmate in exchange for money.

b.  In or about the summer of 2019, a co-conspirator not named herein ("Relative-2") transported a cellular telephone from Poughkeepsie, New York, and delivered that cellular telephone to another co-conspirator not named herein (Individual-3) with the intention and expectation that Individual-3 would deliver the cellular telephone to RICHMOND, who had agreed to smuggle the cellular telephone into the Jail for an inmate in exchange for money.

(Title 18, United States Code, Section 371.)

### COUNT FOUR
### (Bribery - HARMON)

13.  From at least in or about March 2019, up to and including at least in or about September 2019, in the Southern District of New York and elsewhere, JERMAINE HARMON, a/k/a "Mel," the defendant, being a public official, directly and indirectly, corruptly demanded, sought, received, accepted and agreed to receive and accept a thing of value personally and for another person and entity, in return for being influenced in the performance of an official act and being induced to do and omit to do an act in violation of his official duty, to wit, HARMON, a correction officer at the Jail, solicited and accepted bribes from inmates in return for smuggling contraband, including, but not limited to, K2, marijuana, Suboxone, tobacco, and a cellular telephone, into the Jail.

(Title 18, United States Code, Section 201(b)(2)(C).)

### COUNT FIVE
### (Bribery - FAISON)

14.  From at least in or about March 2019, up to and including at least in or about July 2019, in the Southern District of New York and elsewhere, KHARI FAISON, a/k/a "Country," the defendant, being a public official, directly and indirectly, corruptly demanded, sought, received, accepted and agreed to receive and accept a thing of value personally and for another person and entity, in return for being influenced in the performance of an official act and being induced to do and omit to do an act in violation of his official duty, to wit, FAISON, a

correction officer at the Jail, solicited and accepted bribes from inmates in return for smuggling contraband, including, but not limited to, marijuana, K2, tobacco, alcohol, and a cellular telephone, into the Jail.

(Title 18, United States Code, Section 201(b)(2)(C).)

## COUNT SIX
### (Bribery - RICHMOND)

15.   From at least in or about June 2019, up to and including at least in or about November 2019, in the Southern District of New York and elsewhere, COMPTON RICHMOND, a/k/a "Rich," the defendant, being a public official, directly and indirectly, corruptly demanded, sought, received, accepted and agreed to receive and accept a thing of value personally and for another person and entity, in return for being influenced in the performance of an official act and being induced to do and omit to do an act in violation of his official duty, to wit, RICHMOND, a correction officer at the Jail, solicited and accepted bribes from inmates in return for smuggling contraband, including, but not limited to, marijuana, into the Jail.

(Title 18, United States Code, Section 201(b)(2)(C).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

16.   I am a Special Agent with DOJ-OIG and I have been personally involved in the investigation of this matter.  This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## The Jail

17.   Based on my conversations with other law enforcement officers and my review of reports and records, I know the following:

a.    The United States Marshals Service ("USMS") is a federal law enforcement agency within the United States Department of Justice.  Among other things, the USMS is responsible for the care and custody of federal inmates from the time of their arrest by a federal agency and/or remand by a judge until they either are acquitted, committed to their designated Federal Bureau of Prisons ("BOP") institution following a conviction, or otherwise ordered released from USMS custody.

b.    The USMS does not own or operate detention facilities; rather, the USMS houses its inmates at either state or local government facilities, BOP facilities, or private detention facilities.

c.    In New York City, the USMS houses pretrial detainees at several locations, including the Jail, which is a private detention facility in Queens that is run by a company that has a contract with the Department of Justice.

d.    The Jail employs more than 100 people, including more than 60 Correction Officers ("COs").The primary duty of COs at the Jail is to ensure the care, custody, and control of the inmate population.  In connection with this duty, such officers participate in inspections and searches of inmates and the Jail's facilities, and are tasked with, among other things, ensuring that contraband is not brought into the Jail.

e.    According to the Jail's standards of employee conduct, the COs are expressly forbidden from "offer[ing] or giv[ing] a detainee or ex-detainee any article, favor, or service, in the performance of the employee's duties" and from "accept[ing] any gift, personal service or favor from detainees or ex-detainees."  In addition, "[t]he introduction of contraband into or upon the grounds of [the Jail] . . . without the knowledge and consent of the Facility Administrator is prohibited."  Contraband is defined as "any article which is unauthorized" and includes, but is not limited to, "alcoholic beverages [and] drugs."

f.    The Jail is divided into a number of different housing units, or dormitories, each of which is referred to by a letter of the alphabet, *e.g.*, "A Dorm."  Inmates are assigned to a particular dorm, where they spend most of their time.  Inmates with particular jobs at the Jail, such as food service, move between the various dorms in connection with their jobs.

**The Defendants**

18.  Based on my conversations with other law enforcement officers and my review of records from the Jail, I know the following:

a.  JERMAINE HARMON, a/k/a "Mel," the defendant, is currently employed as a CO at the Jail.  HARMON has been employed as a CO at the Jail since in or about 2017.  HARMON provided a telephone number ending in 3413 (the "3413 Cellphone") to the Jail as his cellphone number.  HARMON was placed on administrative leave without pay in or about September 2019.

b.  KHARI FAISON, a/k/a "Country," the defendant, was employed as a CO at the Jail from in or about January 2019 to in or about July 2019, when FAISON resigned.  FAISON provided a telephone number ending in 5842 (the "5842 Cellphone") to the Jail as his cellphone number.

c.  COMPTON RICHMOND, a/k/a "Rich," the defendant, was employed as a CO at the Jail from in or about October 2018 to in or about November 2019, when RICHMOND resigned.  RICHMOND provided a telephone number ending in 2895 (the "2895 Cellphone") to the Jail as his cellphone number.

19.  As set forth herein, I believe that JERMAINE HARMON, a/k/a "Mel," KHARI FAISON, a/k/a "Country," and COMPTON RICHMOND, a/k/a "Rich," the defendants, have abused the power entrusted to them as correctional officers by taking bribes in exchange for smuggling contraband to inmates housed at the Jail, including marijuana and, in HARMON and FAISON's case, K2.  The bribes paid in exchange for the defendants' smuggling typically were funneled to them by the inmates' non-incarcerated associates, usually in cash or via a cellphone payment application.

**HARMON Takes Bribes From Inmate-1, Inmate-2, and Inmate-4 in Exchange for Smuggling Contraband**

20.  Based on my conversations with an inmate at the Jail ("Inmate-1"),[1] my conversations with other law enforcement officers, and my review of debriefing notes, I have learned that

---

[1] Inmate-1 has pleaded guilty pursuant to a cooperation agreement to federal crimes unrelated to the conduct described in this Complaint, and is providing information in the hope of obtaining leniency at sentencing.  The information provided by Inmate-1 has proven to be reliable and has been corroborated, at least in part, by other evidence.

JERMAINE HARMON, a/k/a "Mel," the defendant, has smuggled
contraband, including marijuana, K2, and cigarettes, into the
Jail in exchange for bribe payments from Inmate-1 and another
inmate ("Inmate-2").  In particular, Inmate-1 stated, in
substance and in part:

      a.    Inmate-1 has been detained at the Jail since in or
about the summer of 2017.  Inmate-1 was housed in C Dorm from his
arrival at the Jail until in or about September 2019, when he was
moved to B Dorm.

      b.    In or about the spring or summer of 2019, Inmate-1
had a conversation with Inmate-2 about HARMON.[2]  Inmate-2
reported that he had asked HARMON if HARMON wanted to make some
money.  Following that conversation, HARMON began providing
contraband to Inmate-2 in exchange for bribes.  Specifically, on
multiple occasions during the spring and summer of 2019, Inmate-2
received contraband, including marijuana, K2, and cigarettes,
from HARMON. For example, Inmate-2 explained that he paid HARMON
approximately $2,700 for HARMON to bring Inmate-2 approximately
eight packs of cigarettes, two ounces of marijuana, and one ounce
of K2.  Inmate-2 also stated that in or about the summer of 2019,
he had paid HARMON to smuggle a cellphone into the Jail on his
behalf but that HARMON had never done so.

      c.    On at least one occasion, Inmate-1 observed HARMON
go to the "slop sink" in C Dorm.[3]  Shortly thereafter, Inmate-1
observed Inmate-2 retrieve an item from the slop sink and take
the item to his bed.  Inmate-1 then saw that the item Inmate-2
had retrieved was small ziplock bags surrounded by pepper and
plastic wrap.  Inmate-1 believed that pepper was used to conceal
the smell of the contraband.

      d.    In or about June 2019, Inmate-2 reported that he
had told HARMON that Inmate-1 had money and wanted HARMON to
smuggle contraband into the Jail on his behalf.  Inmate-1 then
approached HARMON, who explained that he charged approximately
$600 per ounce of marijuana smuggled into the Jail.  Following
their conversation, Inmate-1 paid HARMON to smuggle approximately
two ounces of marijuana and a quantity of cigarettes into the

---

[2] Inmate-1 referred to JERMAINE HARMON, a/k/a "Mel," the defendant, as
"Carmen," but identified a photograph of HARMON as the relevant correction
officer.

[3] Based on my training and experience and my debriefing of multiple inmates, I
have learned that the term "slop sink" refers to a small locked closet that
contains cleaning supplies and a utility sink.  To gain access to the slop
sink area, COs use a key to unlock the door.

Jail for Inmate-1.  Inmate-1's girlfriend ("Individual-1") obtained the marijuana, which she provided to HARMON. Individual-1 also paid a $1,200 bribe to HARMON.

      e.   Inmate-1 sold the marijuana and cigarettes to other inmates, who paid Inmate-1 in various ways, including money transfers and Cash App payments to non-incarcerated individuals associated with Inmate-1, such as Individual-1.

      f.   Inmate-1 received contraband from HARMON on approximately three other occasions between approximately July 2019 and approximately August 2019.  Each time, HARMON brought the contraband to the bathroom or the "slop sink" in C Dorm, where HARMON left it for Inmate-1 to collect.  The cigarettes were typically wrapped in plastic wrap, and the marijuana was typically sealed in a ziplock bag and packaged with lotion and pepper to disguise the smell.  Aggregating all of the transactions, Inmate-1 received approximately ten ounces of marijuana and fourteen packs of cigarettes from HARMON.  Each time, Individual-1 paid HARMON on Inmate-1's behalf.  In total, Inmate-1 paid HARMON more than $4,000.

      g.   HARMON offered to smuggle a cellphone into the Jail for Inmate-1 in exchange for $1,600, but Inmate-1 declined, as he did not believe that he could safely conceal the cellphone in the Jail.

      h.   Shortly before HARMON was suspended in or about August 2019, HARMON warned Inmate-1 to "stay low" and "be careful."  HARMON also had a conversation with Inmate-1 in which HARMON named two inmates whom HARMON believed to be "snitches." As HARMON was concerned that the two inmates were providing information about HARMON, he offered Inmate-1 approximately two or three ounces of marijuana in exchange for Inmate-1 assaulting the two inmates.  Inmate-1 declined.

    21.  I have spoken with Individual-1,[4] who corroborated Inmate-1's account of the scheme described above, including the provision of contraband to Inmate-1 by JERMAINE HARMON, a/k/a "Mel," the defendant.  In particular, Individual-1 stated, in substance and in part, the following:

---

[4] Individual-1 has no criminal history and is providing information to the Government in the hope of receiving leniency for her conduct in connection with the bribery scheme described herein.  Information provided by Individual-1 has proven reliable and has been corroborated by independent evidence.

      a.    In or about the spring or summer of 2019, Inmate-1, who is Individual-1's boyfriend, told Individual-1 that a CO had offered to smuggle drugs into the Jail for Inmate-1 in exchange for money.  Inmate-1 directed Individual-1 to meet with a marijuana supplier in the Bronx to obtain marijuana and then meet with the CO to give him the marijuana and the bribe money.  Inmate-1 explained to Individual-1 that he would sell the marijuana to other inmates and make money for their future together.

      b.    Shortly after the visit with Inmate-1, Individual-1 went to the Bronx, where she obtained a plastic bag that she understood contained marijuana.  The same day, Individual-1 exchanged text messages with HARMON,[5] whose phone number she received from Inmate-1, providing him with a meeting location in Queens (the "HARMON Meeting Location").  Late that evening, Individual-1 met with HARMON and provided HARMON with approximately $1,200 cash and the bag that she had obtained in the Bronx.

      c.    After the meeting with HARMON and throughout the summer of 2019, Individual-1 began receiving payments through Western Union and Cash App, which payments she understood to be the proceeds of marijuana sales made by Inmate-1 to other inmates.

      d.    During the summer of 2019, Individual-1 had two additional meetings with HARMON.  Before each meeting, Inmate-1 directed Individual-1 to obtain between two and four ounces of marijuana, which she did in Manhattan.  Individual-1 gave the marijuana to HARMON, as well as the bribe payments, which she paid partly in cash and partly through Cash App.

  22.    I have reviewed records from the Jail and have learned, in substance and in part, the following:

      a.    From in or about late summer 2017 through in or about late summer 2019, except for limited periods when Inmate-1 was in the SHU, Inmate-1 was housed in C Dorm.  Inmate-1 was in C

---

[5] Individual-1 does not recall the full name or nickname of JERMAINE HARMON, a/k/a "Mel," the defendant.  Individual-1 provided a description of the relevant CO that is consistent with HARMON's appearance.  Individual-1 was shown a photobook containing 13 different photographs of different individuals.  When Individual-1 viewed a photograph of HARMON in which he appears clean-shaven, Individual-1 stated that the photograph looked like the relevant CO, except that the relevant CO had a beard when she met him.  I have been informed by Jail personnel that, at times, HARMON had a small beard.

Dorm, and not in the SHU, from in or about early 2019 through in or about late summer 2019.

      b.   From in or about summer 2017 through in or about August 2019, Inmate-2 was housed in C Dorm.

      c.   Throughout the summer of 2019, on various days, JERMAINE HARMON, a/k/a "Mel," the defendant, was assigned to work in C Dorm.

    23.  I have reviewed records from Cash App and have learned, in substance and in part, the following:

      a.   An individual signing up for a Cash App account may provide, among other information, his or her name, date of birth, last four digits of his or her Social Security number, phone number, email, and bank account details. A Cash App account includes a name, one or more display names, and one or more Cashtags (an identifier for sending or receiving peer-to-peer transactions). When an individual sends a payment via Cash App, that individual can include a "Subject" with a description related to the payment.

      b.   Based on the personal information provided, the Cash App name "Jamal Brown" was used by JERMAINE HARMON, a/k/a "Mel," the defendant. For example, the alternative name, date of birth, phone number, and email associated with the Cash App name "Jamal Brown" are all consistent with those of HARMON.

      c.   Using the "Jamal Brown" Cash App account, HARMON engaged in the following transactions:

        i.   On or about April 4, 2019, an individual with the same first and last name as a close relative of Inmate-2 ("Relative-1") paid $1,001 to HARMON.

        ii.   On or about April 29, 2019, Relative-1 paid $525 to HARMON.

        iii.   On or about May 8, 2019, Relative-1 paid $200 to HARMON.

        iv.   On or about July 9, 2019, Relative-1 paid $1,000 to HARMON.

        v.   On or about August 8, 2019, Individual-1 paid $250 to HARMON.

vi.     On or about August 9, 2019, Individual-1 paid $410 to HARMON.

vii.    On or about August 23, 2019, Individual-1 paid $500 to HARMON.

d.    Based on my review of the records for the Cash App account used by Individual-1, as well as my debriefing of Individual-1, I have learned that from at least in or about July 2019 up to and including in or about August 2019, Individual-1 received Cash App payments from individuals whom she believed were paying for contraband purchased from Inmate-1 by other inmates.  Based on my participation in this investigation, I recognize the names of certain of the individuals paying Individual-1 as individuals who are associated with inmates incarcerated in the Jail.

24.  Based on my review of Western Union records, as well as my debriefing of Individual-1, I have learned, in substance and in part, that from at least in or about July 2019 up to and including in or about August 2019, Individual-1 received Western Union payments from individuals who she believed were paying for contraband purchased from Inmate-1 by other inmates.  Based on my participation in this investigation, I recognize at least one of the names of the individuals paying Individual-1 as an individual who is a relative of an inmate incarcerated in the Jail.

25.  I have reviewed records for a bank account in the name of and used by JERMAINE HARMON, a/k/a "Mel," the defendant, and have learned, in substance and in part, the following:

a.    On or about July 22, 2019, HARMON received a $900 deposit through Quickpay with Zelle, an application that allows the user to transmit money to another individual, from Relative-1.

b.    On or about July 29, 2019, HARMON received a $460 deposit through Quickpay with Zelle from Relative-1.

c.    On or about August 2, 2019, HARMON received a $220 deposit through Quickpay with Zelle from Relative-1.

d.    On or about August 6, 2019, HARMON received a $500 deposit through Quickpay with Zelle from Relative-1.

26.   I have reviewed telephone records for the 3413 Cellphone, which is used by JERMAINE HARMON, a/k/a "Mel," the defendant, a cellphone used by Individual-1 (the girlfriend of Inmate-1), and a cellphone used by Relative-1 (a close relative of Inmate-2), and have learned, in substance and in part, the following:

a.   On or about August 7, 2019, at approximately 8:22 p.m., HARMON placed a call to Individual-1.

b.   In or about the evening of August 7, 2019, both the cellphone used by HARMON and the cellphone used by Individual-1 were in the vicinity of the location in Queens where Individual-1 reported meeting with HARMON.

c.   From on or about July 19, 2019 up to and including on or about August 6, 2019, HARMON and Relative-1 engaged in multiple contacts via text message.

27.   I have spoken to additional inmates—identified as "Inmate-3," "Inmate-4," and "Inmate-5,"—all of whom corroborated Inmate-1's account of the scheme described above, including the provision of contraband to Inmate-1 and Inmate-2 by JERMAINE HARMON, a/k/a "Mel," the defendant, based on their observations and/or personal knowledge.   In addition, Inmate-4 engaged in a similar scheme with HARMON.   Specifically, based on my conversations with Inmate-3, Inmate-4, and Inmate-5,[6] I have learned the following, in substance and in part:

a.   Inmate-3 has been incarcerated at the Jail since in or about early 2019.   Inmate-3 was housed in C Dorm until in or about June 2019, when Inmate-3 was transferred to B Dorm. Approximately a month later, Inmate-3 was transferred to D Dorm.[7]

b.   While housed in C Dorm, on numerous occasions, Inmate-3 observed Inmate-2 in possession of various contraband,

---

[6] Inmate-3, Inmate-4, and Inmate-5 have each pleaded guilty pursuant to cooperation agreements to federal crimes unrelated to the conduct described in this Complaint.   Inmate-3, Inmate-4, and Inmate-5 are all providing information in the hope of obtaining leniency at sentencing.   The information provided by Inmate-3, Inmate-4, and Inmate-5 has proven to be reliable and has been corroborated, at least in part, by other evidence.

[7] Jail records confirm that Inmate-3 was housed in C Dorm between approximately April 2019 and May 2019 and that during this same period JERMAINE HARMON, a/k/a "Mel," the defendant, was assigned to work in C Dorm on various days.

including cigarettes, Suboxone,[8] and marijuana, which Inmate-2 distributed to other inmates.  The contraband was often packaged in the fingers of latex gloves, referred to as "loonies."

        c.    On one occasion, in C Dorm, Inmate-3 observed HARMON place a filled finger of a latex glove (the "Loonie") inside a box at the dorm's podium.  Inmate-3 explained that the podium contained multiple boxes that typically held various items, including soap.  HARMON then informed Inmate-2 that HARMON had soap for Inmate-2.  Inmate-3 observed Inmate-2 retrieve the Loonie from the podium where HARMON had placed it.

        d.    Inmate-3 spoke with HARMON approximately one or two times about HARMON smuggling contraband.  Inmate-3 believed HARMON felt comfortable having such conversations with Inmate-3 because Inmate-3 was close with Inmate-2, who had instructed HARMON that HARMON could trust Inmate-3.  In the conversations, HARMON and Inmate-3 discussed the following, in substance and in part:

            i.    Inmate-3 asked HARMON to whom HARMON was giving "299," a coded term used to refer to cigarettes.  HARMON responded that he was giving them to Inmate-1.

            ii.    HARMON explained that in exchange for a pack of cigarettes, he received between $100 and $150, and for a single cigarette, he received approximately $25.

            iii.    HARMON further explained that for Suboxone, he was paid approximately half its cash value inside the Jail, such that if he provided a quantity of Suboxone that sold for $100 inside the Jail, HARMON received $50.

            iv.    HARMON stated that he was not making sufficient money from his paychecks, so he had to resort to "hustling," which Inmate-3 understood to refer to smuggling contraband to inmates in exchange for bribes.

            v.    HARMON explained that he was paid through Cash App.

---

[8] Based on my training and experience, my participation in this investigation, and my debriefing of multiple inmates, I have learned that Suboxone is the brand name for a prescription medication containing a combination of buprenorphine and naloxone, often in a film.  I believe that when inmates use the term "Suboxone," they are referring to either the brand name or generic form of the medication.

e.     Inmate-4 has been incarcerated at the Jail since in or about fall 2017 and has been housed in C Dorm since his arrival.[9]

f.     Beginning in or about the spring of 2019, Inmate-4 occasionally purchased cigarettes from Inmate-2, paying for the cigarettes with food.  Inmate-2 told Inmate-4 that the cigarettes were being delivered by HARMON.

g.     On one occasion in or about the summer of 2019, Inmate-4 observed Inmate-2 speaking with HARMON.  Inmate-2 then requested that Inmate-4, who worked cleaning the dorm as a porter, retrieve something on his behalf from the slop sink. HARMON unlocked the door to the slop sink for Inmate-4 to get cleaning supplies for his porter duties.  As HARMON opened the door, Inmate-4 observed HARMON reach into his pants and remove an object, which HARMON threw on the floor of the slop sink area. HARMON then returned to the dorm's podium.  Inmate-4 picked up the object that HARMON had thrown on the floor and saw that it consisted of a number of clear plastic bags containing loose cigarettes.  Inmate-4 concealed the cigarettes in his clothing and delivered them to Inmate-2.  In exchange for retrieving the cigarettes, Inmate-2 allowed Inmate-4 to smoke some cigarettes for free.

h.     In or about August 2019, after Inmate-2 left the Jail, HARMON asked Inmate-4 if Inmate-4 wanted cigarettes. HARMON explained that the price was $900 for five packs of cigarettes.  Inmate-4 did not have that much money at the time. HARMON explained that Inmate-2 had an outstanding debt of $300. Inmate-4 suggested that HARMON give him a pack of cigarettes and that he would clear Inmate-2's debt with the proceeds from selling the cigarettes.  HARMON agreed and brought Inmate-4 a single pack of cigarettes.

i.     Out of the pack of cigarettes provided by HARMON, Inmate-4 sold four cigarettes for $25 each, for a total of $100. The inmates who purchased the cigarettes sent money via Cash App to a non-incarcerated associate of Inmate-4 ("Individual-2"). Individual-2 then sent HARMON approximately $100 via Cash App. Inmate-4 never paid HARMON the remaining $200.

j.     In or about the summer of 2019, on approximately two occasions, Inmate-5 purchased marijuana from Inmate-1, who

---

[9] Jail records corroborate this information.

stated that he was getting the marijuana from HARMON.[10]  Inmate-5 paid by having a non-incarcerated individual transfer money via transfer services to non-incarcerated individuals associated with Inmate-1, including Individual-1.

      k.   In or about late summer 2019, Inmate-5 heard rumors that HARMON was saying that Inmate-5 was providing information about HARMON.  Inmate-5 confronted HARMON, who explained that he had received a call from another CO who relayed that Inmate-5 was "telling on" HARMON.  Inmate-5 denied HARMON's allegations.

      28.   I have reviewed records for the "Jamal Brown" Cash App account used by JERMAINE HARMON, a/k/a "Mel," the defendant, and have learned, in substance and in part, that on or about August 19, 2019, an individual with the same name as Individual-2 (as noted above, a non-incarcerated associate of Inmate-4) sent HARMON $100 via Cash App.  The Subject for the payment read "[Inmate-4's] Girl, 100 towards what I owe [] 200 left."

### HARMON Solicits Bribes From Inmate-6 in Exchange for Smuggling Contraband

      29.   Based on my conversations with an inmate at the Jail ("Inmate-6"),[11] my conversations with other law enforcement officers, and my review of debriefing notes, I have learned that Inmate-6 has reported that JERMAINE HARMON, a/k/a "Mel," the defendant, smuggled contraband, including a cellular telephone and cigarettes, into the Jail for Inmate-6 in exchange for bribe payments.  In particular, Inmate-6 stated, in substance and in part:

      a.   Inmate-6 has been at the Jail since in or about early 2018 and has been housed in B Dorm during the entire time.[12]

---

[10] Inmate-5 referred to JERMAINE HARMON, a/k/a "Mel," the defendant, as "Mel," and identified a photograph of HARMON as the relevant correction officer.

[11] Inmate-6 has pleaded guilty to crimes unrelated to the conduct described in this Complaint, and is providing information in the hope of obtaining leniency from the parole board as a result of his assistance with federal investigations.  The information provided by Inmate-6 has proven to be reliable and has been corroborated, at least in part, by other evidence.

[12] Jail records corroborate this information, except that Inmate-6 spent a month in the SHU in the summer of 2019.  In addition, throughout the spring and summer of 2019, on various days, JERMAINE HARMON, a/k/a "Mel," the defendant, was assigned to work in B Dorm.

b.     In or about spring 2019, HARMON[13] offered to let Inmate-6 use HARMON's cellphone—a recent model iPhone (the "First iPhone")—for a few hours while HARMON was on duty.  HARMON provided the password to Inmate-6, who returned the First iPhone to HARMON a few hours later.  On or about two or three other occasions, HARMON again allowed Inmate-6 to use the First iPhone while HARMON was on duty.  HARMON did not ask Inmate-6 for anything in return.

c.     Between one and two months later, HARMON offered Inmate-6 a different cellphone—a smaller iPhone (the "Second iPhone").  Unlike with the First iPhone, HARMON intended to sell the Second iPhone to Inmate-6 in exchange for $4,000.  Inmate-6 said that he would try to find a buyer for the Second iPhone, and HARMON gave the Second iPhone to Inmate-6 to keep while he was looking for a buyer.  A short time later, HARMON provided Inmate-6 with a charger for the Second iPhone.

d.     Inmate-6 was in possession of the Second iPhone for approximately two months, during which time he let a few other inmates use the Second iPhone.  Inmate-6 never, in fact, looked for a buyer for the Second iPhone.

e.     At one point while Inmate-6 was in possession of the Second iPhone, HARMON asked Inmate-6 to return the Second iPhone, as Inmate-6 had not paid HARMON for it.  Inmate-6 stalled saying that another inmate was interested in purchasing the Second iPhone, which was not the case.

f.     In or about late summer 2019, HARMON provided Inmate-6 with a pack of cigarettes.  Inmate-6 agreed to pay HARMON out of the proceeds from selling the cigarettes.  Inmate-6 sold the cigarettes to other inmates, who paid him with food and with monetary deposits into Inmate-6's commissary account.  However, Inmate-6 never paid HARMON for the cigarettes.

g.     In or about late summer 2019, officials at the Jail found the Second iPhone, and Inmate-6 was sent to the SHU.[14]

30.   I have spoken to the inmate identified above as Inmate-3, who stated that, while in B Dorm, Inmate-3 frequently observed

---

[13] Inmate-6 referred to JERMAINE HARMON, a/k/a "Mel," the defendant, as "Mel," and identified a photograph of HARMON as the relevant correction officer.

[14] Jail records confirm that officers found a cellphone in B Dorm in or about August 2019, and that Inmate-6 was disciplined for his possession of the cellphone by being moved to the SHU for approximately 60 days.

Inmate-6 in possession of an iPhone and also observed HARMON
provide cigarettes to Inmate-6.  On approximately three
occasions, HARMON went close to a particular trashcan in B Dorm
and asked Inmate-6 to come to that location.  Once there, Inmate-
6 reached into the trashcan and then appeared to conceal
something in the vicinity of his crotch.  Later in the day,
either Inmate-3 observed Inmate-6 with cigarettes or Inmate-6
informed Inmate-3 that he was in possession of cigarettes.

### HARMON Offered Money to Another Inmate to Store Contraband on HARMON's Behalf

31.   Based on my conversations with an inmate at the Jail
("Inmate-7"),[15] my conversations with other law enforcement
officers, and my review of debriefing notes, I have learned that
Inmate-7 has reported that JERMAINE HARMON, a/k/a "Mel," the
defendant, offered to smuggle contraband, including marijuana and
a cellphone, into the Jail for Inmate-7 in exchange for bribe
payments.  In particular, Inmate-7 stated, in substance and in
part:

a.   Inmate-7 was an inmate at the Jail from in or
about early 2016 until in or about the fall of 2019.  Inmate-7
was housed in E Dorm from in or about mid-2017 until in or about
September 2018, when he was transferred to G Dorm.[16]

b.   In or about the spring or summer of 2019, Inmate-7
had multiple conversations with HARMON[17] regarding smuggling
contraband into the Jail.  In particular, HARMON specified that
he had brought both marijuana and Suboxone into the Jail.

c.   HARMON offered to provide Inmate-7 a cellphone in
exchange for money, but Inmate-7 declined the offer.  HARMON also
suggested that, in exchange for money, Inmate-7 could store
marijuana for HARMON because Inmate-7 was housed in a quiet dorm
that was rarely searched.  Inmate-7 responded that he was not

---

[15] Inmate-7 pleaded guilty pursuant to a cooperation agreement to federal
crimes unrelated to the conduct described in this Complaint and has been
sentenced pursuant to the terms of the cooperation agreement.  The information
provided by Inmate-7 has proven to be reliable and has been corroborated, at
least in part, by other evidence.

[16] Jail records corroborate Inmate-7's housing history.  In addition,
throughout the spring and summer of 2019, on various days, JERMAINE HARMON,
a/k/a "Mel," the defendant, was assigned to work in G Dorm.

[17] Inmate-7 referred to JERMAINE HARMON, a/k/a "Mel," the defendant, as "Mel,"
and identified a photograph of HARMON as the relevant correction officer.

sure whether he would take HARMON up on his offer and that he
wanted to think about it.  Ultimately, Inmate-7 never agreed to
HARMON's proposal.

      d.   On one occasion, Inmate-7 noticed that HARMON
smelled very strongly of marijuana and told HARMON so.  In
response, HARMON took a clear bag of marijuana out of his pocket.
HARMON joked that he would throw the bag of marijuana on Inmate-
7's bed so that Inmate-7 would get in trouble.

### FAISON Accepts Bribes from Inmate-8 and Inmate-9
### In Exchange for Smuggling Contraband

    32.   Based on my conversations with another inmate at the
jail ("Inmate-10"), my conversations with other law enforcement
officers, and my review of debriefing notes, I have learned that
Inmate-10 has reported that KHARI FAISON, a/k/a "Country," the
defendant, smuggled contraband, including marijuana, cigarettes,
and alcohol, into the Jail for another inmate ("Inmate-8").  In
particular, Inmate-10[18] has stated the following, in substance and
in part:

      a.   Inmate-10 has been detained at the Jail since in
or about early 2018.  Inmate-10 was initially housed in B Dorm
for a few months, after which time he was transferred to A Dorm.

      b.   Inmate-10 first became aware of drugs in A Dorm in
or about early 2019.  Inmate-10 observed a few inmates in A Dorm
in possession of and/or distributing marijuana, including Inmate-
8.

      c.   One day while detained in A Dorm, Inmate-10 was
playing cards with other inmates when the CO shift came and
FAISON arrived in A Dorm.  Inmate-10 noticed that FAISON smelled
strongly of marijuana.  FAISON proceeded to the bathroom, which
Inmate-8 was cleaning, even though it was not Inmate-8's job to
clean the bathroom.  FAISON returned from the bathroom, and
Inmate-10 could no longer detect the smell of marijuana on
FAISON.  That evening, Inmate-10 observed Inmate-8 breaking down
a larger quantity of marijuana into small amounts for
distribution.

---

[18] Inmate-10 has pleaded guilty pursuant to a cooperation agreement to federal
crimes unrelated to the conduct described in this Complaint.  Inmate-10 is
providing information in the hope of obtaining leniency at sentencing.  The
information provided by Inmate-10 has proven to be reliable and has been
corroborated, at least in part, by other evidence.

    d.    Inmate-10 observed what appeared to be drug deliveries by FAISON on one or two other occasions.  Once, Inmate-10 watched FAISON go to the closet containing the slop sink and open the door.  Inmate-8 thereafter went into the slop sink closet.  Later that day, Inmate-10 observed Inmate-8 in possession of marijuana, although Inmate-8 was frequently in possession of marijuana.

33.  I have spoken with a friend ("Individual-3") of another inmate ("Inmate-9"), who corroborated Inmate-10's account of the scheme described above.  In addition, Individual-3 disclosed her own role paying bribes to KHARI FAISON, a/k/a "Country," the defendant, in exchange for delivering contraband to Inmate-8 and Inmate-9.[19]  Specifically, based on my conversations with Individual-3,[20] I have learned the following, in substance and in part:

    a.    Individual-3 and Inmate-9 remained in contact after Inmate-9's incarceration at the Jail, both by telephone and in in-person visits.

    b.    In or about May 2019, Inmate-9 asked Individual-3 to pick up a package on his behalf.  Inmate-9 also instructed Individual-3 to create another telephone number that she could use in connection with the transaction.  According to Inmate-9, the person who would be delivering the package was a relative of Inmate-8 ("Relative-2") who came from Poughkeepsie, New York.

    c.    Shortly thereafter, Individual-3 and Relative-2 met near a bar in Long Island (the "Bar"), where Relative-2 provided Individual-3 with a bag containing, among other things, marijuana.

    d.    Inmate-9 told Individual-3 that she would receive text messages from the person to whom she would give the marijuana she had picked up from Relative-2.  Within a few days, Individual-3 received such text messages and arranged a meeting

---

[19] Jail records confirm that between approximately late 2018 and fall 2019, Inmate-8, Inmate-9, and Inmate-10 were all housed in A Dorm.  Throughout the spring and summer of 2019, KHARI FAISON, a/k/a "Country," the defendant, was assigned to work in A Dorm on various days.  FAISON resigned from his employment at the Jail in or about July 2019.

[20] Individual-3 has no criminal history and is providing information to the Government in the hope of receiving leniency for her conduct in connection with the bribery scheme described herein.  Information provided by Individual-3 has proven reliable and has been corroborated by independent evidence.

at a Dunkin' Donuts.  At Inmate-9's direction, before the meeting, Individual-3 obtained approximately $100 from a relative of Inmate-9 and approximately two packs of cigarettes.

      e.  At the Dunkin' Donuts, Individual-3 met with KHARI FAISON, a/k/a "Country," the defendant, who was wearing his uniform from the Jail.[21]  Individual-3 provided FAISON with the bag containing marijuana, the cigarettes, and $100 in cash.

      f.  After the meeting with FAISON, Individual-3 began receiving frequent deposits into her Cash App account, which money she understood to be the proceeds from Inmate-9's sale of the marijuana and cigarettes that she had provided to FAISON. Due to the amount of money coming into the account, Individual-3 created a second Cash App account and opened a new bank account.

      g.  Over the next few months, Individual-3 made approximately three additional deliveries to FAISON at the direction and on behalf of Inmate-9.  Before each meeting with FAISON, Individual-3 met with Relative-2, who provided Individual-3 with marijuana.  On certain occasions, Relative-2 also brought alcohol or K2.  Relative-2 also informed Individual-3 that he lived in Poughkeepsie, New York, and was travelling from Poughkeepsie to make deliveries to Individual-3.  Before certain of the meetings with FAISON, Individual-3 purchased cigarettes or alcohol to provide to FAISON.

      h.  Each time that Individual-3 met with FAISON to give him the contraband, she paid him.  On one occasion, Individual-3 paid FAISON $200 in cash.  At the other two meetings, because Individual-3 did not have any cash, FAISON directed Individual-3 to send money to his brother's Cash App account.

      i.  In or about July 2019, before the fourth meeting with FAISON, Relative-2 came from Poughkeepsie to Long Island, where he met with Individual-3 and provided her with marijuana and another substance that Individual-3 believed was K2. Approximately a day later, Individual-3 drove to Poughkeepsie to meet Relative-2, who had forgotten to bring a cellphone with him the previous day.  In Poughkeepsie, Relative-2 gave Individual-3 a cellphone.  Approximately a week later, when Individual-3 met with FAISON, she provided him with the marijuana, K2, and the cellphone to smuggle into the Jail for Inmate-9.  Because

---

[21] Individual-3 specifically recalled the last name of KHARI FAISON, a/k/a "Country," the defendant, and identified a photograph of FAISON from a photobook containing 13 different photographs of different individuals.

Individual-3 did not have any cash on hand, FAISON instructed her to send $300 to his brother's Cash App account.

       j.   Sometime thereafter, Individual-3 learned from Inmate-9 that Inmate-9 had never received the contraband from FAISON.  Inmate-9 instructed Individual-3 to attempt to get the $300 back from FAISON.  Individual-3 tried to do so, but was unsuccessful.  As a result, Individual-3 contacted FAISON and requested that he return the contraband to her.  They exchanged a number of text messages, but FAISON never returned the items.

    34.   I have reviewed text messages, call logs, and contact entries from screenshots from and a forensic report of the cellphone used by Individual-3 and have learned, in substance and in part, the following:

       a.   Between in or about June 2019 and in or about late July 2019, KHARI FAISON, a/k/a "Country," the defendant, using the 5842 Cellphone, and Individual-3 were in contact by voice call and by text message.

       b.   On or about June 4, 2019, Individual-3 texted FAISON, "Hey am I meeting up with you today," and FAISON responded, "Yeah that's cool!  D[o] you have everything yet[?]"

       c.   On or about June 8, 2019, Individual-3 texted FAISON, "Hey imma [sic] send your money to your brother[] again," and FAISON responded, "Ok cool cool / Thanks."

       d.   On or about June 11, 2019, Individual-3 texted FAISON, "Hey when you going back to the day shift?" FAISON responded, "Tomorrow / What's up / See if he [Inmate-9] can send another $100 & I bring another Bottle & some shorts or whatever they need."

       e.   On or about June 14, 2019, Individual-3 texted FAISON, "Hey he [Inmate-9] said what's good and I sent money to the same spot / Do you have somewhere else I can send it[,] it's not working."[22]

       f.   On or about June 20, 2019, Individual-3 texted FAISON, "Okay he [Inmate-9] said get a dub for now."  Based on my

---

[22] I have reviewed telephone records for the 5842 Cellphone, which is used by KHARI FAISON, a/k/a "Country," the defendant, and a cellphone used by Individual-3, and have learned, in substance and in part, that on or about June 19, 2019, FAISON called Individual-3 twice, once at approximately 9:21 p.m. and again approximately 8 minutes later.

conversations with Individual-3, I believe that a "dub" refers to two grams of marijuana.

g.   The following day, FAISON and Individual-3 texted to make arrangements to meet, and Individual-3 told FAISON that she had also gotten "Newport's."

h.   On or about July 5, 2019, Individual-3 and FAISON exchanged a number of text messages arranging an in-person meeting.

i.   Beginning in or about early July 2019, Individual-3 sent a number of text messages to FAISON trying to arrange a meeting, which Individual-3 said was for FAISON to return the items that he had never delivered to Inmate-9.  On or about July 14, 2019, Individual-3 texted FAISON, "Did your brother get it? He [Inmate-9] said send it back."  On or about July 24, 2019, Individual-3 texted FAISON, "Okay he said can [you] give back the jack[23] and the $300?"  FAISON responded with a series of laughing emojis.

j.   Individual-3 exchanged frequent text messages with Relative-2, including messages on or about July 4, 2019 and July 5, 2019 about Individual-3 going to Poughkeepsie to meet with Relative-2.

35.   I have reviewed records from Cash App and have learned, in substance and in part, the following:

a.   Based on the personal information provided, and my conversations with Individual-3, I believe that the Cash App name "Khalil Faison" was used by a relative of KHARI FAISON, a/k/a "Country," the defendant, to receive payments from Individual-3.

b.   Based on my review of the records for the Khalil Faison Cash App account, as well as one of the CashApp accounts used by Individual-3, I learned, in substance and in part, the following:

i.   On or about June 2, 2019, Individual-3 paid $100 to the Khalil Faison Cash App account.  The Subject listed for the payment was "faison [sic]."

---

[23] Individual-3 explained that the term "jack" referred to a cellphone.

ii.    On or about June 9, 2019, Individual-3 paid $100 to the Khalil Faison Cash App account.  The Subject listed for the payment was "faison [sic]."

iii.    On or about June 14, 2019, Individual-3 attempted to pay $300 to the Khalil Faison Cash App account, but the payment was declined.  The Subject listed for the payment was "faison [sic]."

d.    Based on my review of the records for one of the Cash App accounts used by Individual-3, as well as my debriefing of Individual-3, I have learned, in substance and in part, that from at least in or about June 2019 up to and including in or about August 2019, Individual-1 received Cash App payments from individuals whom she believed were paying for contraband purchased from Inmate-9 by other inmates.  Based on my participation in this investigation, I recognize the names of certain of the individuals paying Individual-3 as individuals who are associated with inmates incarcerated in the Jail.

### FAISON Solicits Bribes from Another Inmate
### In Exchange for Smuggling Contraband

36.    Based on my conversations with the inmate identified *supra* as Inmate-7, my conversations with other law enforcement officers, and my review of debriefing notes, I have learned that Inmate-7 has reported that KHARI FAISON, a/k/a "Country," the defendant, offered to smuggle marijuana into the Jail for Inmate-7 in exchange for bribe payments.  In particular, Inmate-7 stated, in substance and in part:

a.    In or about the spring or summer of 2019, in G Dorm,[24] Inmate-7 had a conversation with KHARI FAISON, a/k/a "Country," the defendant, in which they discussed, in substance and in part, smuggling contraband into the Jail.[25]  FAISON stated

---

[24] Throughout the spring and summer of 2019, on various days, KHARI FAISON, a/k/a "Country," the defendant, was assigned to work in G Dorm.

[25] While Inmate-7 did not know the name of KHARI FAISON, a/k/a "Country," the defendant, the description that Inmate-7 provided of the relevant CO is consistent with FAISON's appearance and manner of speaking.  Inmate-7 further identified the relevant CO as having quit.  Based on my training and experience and review of documents from the Jail, I have learned that FAISON resigned from his employment at the Jail in or about July 2019.  On viewing a photograph of FAISON, Inmate-7 described the photograph as looking like an older photograph of the relevant CO, but Inmate-7 was not completely sure.  In light of the description of the relevant CO provided by Inmate-7, including the fact that the relevant CO quit, as well as Inmate-7's statements when viewing the photograph of FAISON, I believe FAISON to be the relevant CO.

that certain COs who were previously arrested for smuggling contraband had not been doing it right and that FAISON knew how to smuggle contraband correctly.

      b.    FAISON offered to smuggle marijuana into the Jail for Inmate-7, explaining that the charge was $1,000 for any quantity of marijuana over an ounce.  FAISON further explained that Inmate-7 would have to have non-incarcerated individuals meet with FAISON outside of the Jail to provide FAISON with the marijuana and cash.  Ultimately, Inmate-7 did not agree to FAISON's proposal.

### RICHMOND Accepts Bribes from Inmate-9
### In Exchange for Smuggling Contraband

    37.   Based on my conversations with another inmate at the jail ("Inmate-11"), my conversations with other law enforcement officers, and my review of debriefing notes, I have learned that Inmate-11 has reported that COMPTON RICHMOND, a/k/a "Rich," the defendant, smuggled contraband into the Jail for Inmate-9.  In particular, Inmate-11[26] has stated the following, in substance and in part:

      a.    Inmate-11 was detained at the Jail from in or about the summer of 2019 to in or about the fall of 2019, and was housed in A Dorm for the entire time.

      b.    In or about the fall of 2019, Inmate-11 observed COMPTON provide contraband to Inmate-9 in A Dorm on two occasions.  First, Inmate-11 was present in the bathroom of A Dorm, where he personally observed RICHMOND meet Inmate-9.  Once inside the bathroom, RICHMOND handed Inmate-9 a black plastic shopping bag and then left the bathroom.  After RICHMOND left the bathroom, Inmate-9 showed Inmate-11 the contents of the black plastic shopping bag, which included items that Inmate-11 recognized to be cigarettes and K2.

      c.    Second, Inmate-11 was present in A Dorm when he observed RICHMOND place a black plastic bag in the microwave in the dorm.  Inmate-11 then observed another inmate ("Inmate-12") go to the microwave and retrieve the black plastic bag.  Inmate-11 then observed Inmate-12 remove K2 from the black plastic bag.

---

[26] Inmate-11 has pleaded guilty pursuant to a cooperation agreement to federal crimes unrelated to the conduct described in this Complaint.  Inmate-11 is providing information in the hope of obtaining leniency at sentencing.  The information provided by Inmate-11 has proven to be reliable and has been corroborated, at least in part, by other evidence.

       d.    In the days after both of these two hand-offs, Inmate-11 observed Inmate-9 and Inmate-12 together repackaging the K2 into smaller packages to sell to other inmates. Inmate-11 also personally observed Inmate-9 and Inmate-12 selling that K2, as well as cigarettes, to other inmates.

       e.    Also in or around the fall of 2019, Inmate-9 told Inmate-11 that a female outside of the Jail met RICHMOND to provide him with cash at Inmate-9's direction. Inmate-9 remarked that RICHMOND preferred to receive cash instead of payment through Cash App.

   38.   I have spoken with Individual-3, who corroborated Inmate-11's account of the scheme described above. In addition, Individual-3 disclosed her own role paying bribes to COMPTON RICHMOND, a/k/a "Rich," the defendant, in exchange for delivering contraband to Inmate-9.[27] Specifically, based on my conversations with Individual-3, I have learned the following, in substance and in part:

       a.    In or about July or August 2019, Inmate-9 directed Individual-3 to meet an individual who would contact her by text message. Shortly thereafter, Individual-3 began communicating by text message with the user of the 2895 Cellphone. Through those text communications, Individual-3 ultimately arranged to meet with RICHMOND at the Bar on two occasions in or around the summer of 2019.[28]

       b.    Over the course of her two meetings with RICHMOND, Individual-3 provided RICHMOND with two items to smuggle into the Jail to Inmate-9: about two ounces of marijuana and a bottle that appeared to contain vitamin or muscle supplement pills. In addition, Individual-3 provided RICHMOND with $100 in cash. Individual-3 could not clearly recall which of these items she

---

[27] Throughout the summer and fall of 2019, on various days, COMPTON RICHMOND, a/k/a "Rich," the defendant, was assigned to work in A Dorm, where Inmate-11 and Inmate-9 were housed at the time.

[28] COMPTON RICHMOND, a/k/a "Rich," the defendant, provided the number of the 2895 Cellphone to the Jail as his cellphone number. Individual-3 provided a description of the relevant individual that is consistent with RICHMOND's appearance and viewed a photograph of RICHMOND, saying that the person in the photograph resembled the person whom she met at the Bar on two occasions in the summer of 2019, but that she was not entirely sure. Individual-3 further stated that she understood from her conversations with Inmate-9 that the person she met at the Bar on two occasions in the summer of 2019 was a guard at the Jail. As such, I believe that the person who Individual-3 met at the Bar on two occasions in the summer of 2019 was RICHMOND.

provided during which of her two meetings with RICHMOND.  Upon
reviewing text messages from her cellphone, however, Individual-3
believed that she provided the marijuana to RICHMOND during their
first meeting, which she believes took place on or about July 5,
2019, and that she provided the pill bottle and $100 in cash
during their second meeting, which she believes took place on or
about August 30, 2019.

       c.   Individual-3 explained that she purchased the
marijuana she provided RICHMOND from a relative of hers
("Relative-3").  Individual-3 further explained that she obtained
the pill bottle from Relative-2, who travelled from Poughkeepsie,
New York, to deliver the bottle to her.

       d.   After receiving the bottle from Relative-2,
Individual-3 spoke with Inmate-9, who instructed Individual-3 to
purchase an identical bottle from a store.  After Individual-3
did so, Inmate-9 asked her which bottle was heavier, and
Individual-3 responded that the bottle that Relative-2 had
provided was heavier than the apparently identical bottle she had
purchased from the store.  Individual-3 understood these
differing weights to mean that Relative-2 had placed some sort of
contraband inside the heavier bottle.  Inmate-9 then directed her
to return the lighter bottle to Relative-2, which she did.

       e.   Also in or around the summer of 2019, Inmate-9
told Individual-3 to provide a cellphone to RICHMOND in order for
RICHMOND to smuggle it in to the Jail for Inmate-9.  Following
these instructions, Individual-3 communicated via text message
with RICHMOND about how to conceal a cellphone for him to smuggle
into the Jail.  Around this same time, Relative-2 brought a
cellphone from Poughkeepsie to Individual-3 for her to provide to
RICHMOND to smuggle into the Jail.  Ultimately, though,
Individual-3 was unable to conceal the cellphone in the manner
that RICHMOND requested, and as a result, she did not provide the
cellphone from Relative-2 to RICHMOND.

    39.   I have reviewed text messages, call logs, and contact
entries from screenshots and a forensic report from the cellphone
used by Individual-3 and have learned, in substance and in part,
the following:

       a.   Individual-3 exchanged multiple text messages with
COMPTON RICHMOND, a/k/a "Rich," the defendant, who was using the
2895 Cellphone, including messages in or about July 2019 and
August 2019 arranging in-person meetings.  Based on these text

messages, it appears that RICHMOND and Individual-3 met in person on or about July 5, 2019 and August 30, 2019.

b.    Individual-3 also exchanged multiple text messages with Relative-2 in or about July and August 2019 arranging in-person meetings.

c.    On or about July 5, 2019, RICHMOND texted Individual-3, "Can you meet now?"  Individual-3 responded in the affirmative and sent RICHMOND the address of the Bar.  The two then exchanged additional text messages in an attempt to meet, during which Individual-3 described her location in more detail. The exchange ended with RICHMOND texting Individual-3, "I see you."

d.    On or about August 15, 2019, Individual-3 texted RICHMOND, "[Inmate-9] said are you serious? I hope you joking." RICHMOND replied, "Joking about shit being hot?"  I understand from my conversations with Individual-3 that she understood RICHMOND's reply to refer to increased scrutiny by supervisors at the Jail focused on guards who were suspected of smuggling contraband to inmates.

e.    On or about August 29, 2019, Individual-3 texted Relative-2, "You sure you gunna be here around 1?"  In response, Relative-2 texted, "Yea I'm leaving upstate at like 11:30."  I understand from my conversations with Individual-3 that during this exchange, Relative-1 confirmed that he was travelling from Poughkeepsie to deliver a cellphone for Individual-3 to provide to RICHMOND to smuggle into the Jail.

f.    On or about August 30, 2019, RICHMOND texted Individual-3 with instructions: "Get electrical tape and some Saran Wrap. Wrap the phone with the Saran Wrap. Then wrap it all over with the electrical tape. Do it all over again and make sure it is secure and intact. Black tape must be wrapped all over." Individual-3 asked, "What time we meeting?"  RICHMOND responded, "I get off at 11."  Individual-3 later texted RICHMOND, "I can't find black tape."  Later that same evening, the two exchanged text messages in an attempt to meet.  Near the end of that exchange, Individual-3 texted RICHMOND, "Okay coming outside," and RICHMOND responded, "The front right ? [sic]"  Individual-3 responded, "Yea," and RICHMOND answered, "Alright."

g.    Also on or about August 30, 2019, Individual-3 texted Relative-2, "You have the phone?"  Relative-2 responded, "Yea," and Individual-3 responded, "Okay he said we gotta Saran

Wrap it and cover it with black tape[.]"   Individual-3 also texted Relative-2, "Can you find black tape?  He said it has to be black[.]"

WHEREFORE, I respectfully request that arrest warrants be issued for JERMAINE HARMON, a/k/a "Mel," KHARI FAISON, a/k/a "Country," and COMPTON RICHMOND, a/k/a "Rich," the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

OMAR DAZA
Special Agent
Department of Justice
Office of the Inspector General


Sworn to before me this
25th day of February, 2020


THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK